**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID KRUPA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-543 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MARTY QUINN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff David Krupa is a teenager who wanted to be a Chicago alderman. He didn't want to be an alderman *someday*, after grinding it out and working his way up the political ladder. He wanted to be an alderman, here and now, during his college years.

He faced significant roadblocks, above and beyond his relative youth and inexperience. In particular, he decided to run against a powerful local alderman. And not just any alderman. He wanted to run against Marty Quinn, a favorite of Speaker Michael Madigan. He decided to run against a political heavyweight, right in his own backyard.

Krupa ambitiously got to work, rolled up his sleeves, and hit the pavement. He started going door to door, asking for signatures to get his name on the ballot. And that's when the political hijinks started. Quinn and Madigan, it seems, were none too pleased that a political upstart was canvassing their turf, glad-handing the neighborhood, and competing for votes.

According to the complaint, Quinn and Madigan opened a bag of dirty political tricks. They sent political heavies to harass and intimidate Krupa when he went door to door. They cajoled voters into not supporting him. And when he got enough signatures to get on the ballot, they submitted thousands of revocations, trying to take it all away.

The political hijinks didn't work. Krupa got on the ballot. But that's as far as he got. When it was all said and done, Quinn received over 85% of the vote. The people of the Thirteenth Ward delivered an overwhelming defeat – the political equivalent of a knockout – to the young up-and-comer.

Before election day, Krupa sued Marty Quinn, Michael Madigan, and related organizations under section 1983 and the Illinois Election Code. He alleged that they violated his First and Fourteenth Amendment rights and conspired to sabotage his campaign. He didn't ask for equitable relief, such as an injunction to stop the political hijinks or preserve his name on the ballot. He wanted damages.

Defendants moved to dismiss. For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

David Krupa lives in Chicago's Thirteenth Ward, located on the far southwest side, just south of Midway Airport. *See* Am. Cplt., at ¶ 7 (Dckt. No. 36). The ward is quiet and residential, a neighborhood of bungalows and flats. https://www.nbcchicago.com/news/local/chicago-politics/get-to-know-your-ward-13th-ward/113653/ (last visited March 31, 2022).

According to Krupa, that quiet ward is the hometown of political power and corruption. He alleges that (former) Speaker of the House Michael Madigan maintained a stranglehold on local politics in the ward for more than 50 years.

Madigan has a long history in the ward, stretching back five decades. He began serving as Democratic Committeeman of the Thirteenth Ward in 1972. *See* Am. Cplt., at ¶ 11 (Dckt. No. 36). Putting that date in perspective, 1972 was the year of the Watergate burglary.

Madigan was the state representative for Illinois House District 22 (encompassing the Thirteenth Ward) from 1971 until 2021, a term of fifty years. *Id.* at ¶ 8.[1] During that run, Madigan accumulated unrivaled governmental and political power within the state. *Id.* at ¶ 15. Except for one year, Madigan served as the Speaker of the Illinois House from 1983 to 2021. *Id.* at ¶ 9. And he sat as Chairman of the Democratic Party of Illinois from 1998 to 2021. *Id.* at ¶ 10.

Madigan pulled the purse strings. He had the power of the purse in state government, and controlled the political war chest of the Democratic Party. *Id.* at ¶¶ 13–14. Madigan also exercised sweeping power over political appointments at all levels, too. *Id.* at ¶ 14. He "virtually dictate[s]" who will serve in public office. *Id.* at ¶ 15.

Krupa alleges that Madigan used his power to install "surrogate[s]" in various political posts, including aldermen. *Id.* at ¶¶ 14–16, 20. One of those surrogates is Marty Quinn, the alderman of the Thirteenth Ward.

According to the complaint, Quinn is Madigan's close ally and political protégé. *Id.* at ¶¶ 17–20. Quinn earned his position by bowing to whatever Madigan wanted. Quinn became an elected official "exclusively through the political support of [Madigan]," and "exercises [his]

---

[1] When Krupa filed the operative complaint, Madigan continued to serve in the Illinois House. He resigned in 2021.

power strictly as a surrogate of [Madigan]." *Id.* at ¶ 19. Quinn "supports all political positions and operations of [Madigan] as a loyal surrogate, and receives and follows the directives of [Madigan] concerning political matters." *Id.* According to the complaint, Quinn is the puppet, and Madigan is the puppet master.

In 2018, Krupa, an 18-year-old high school student, "became fed up with the machine politics of Chicago and the 13ᵗʰ Ward," and decided to run for alderman against Quinn. *Id.* at ¶ 30. He got a quick start on his political career, launching himself into the public arena not long after he became eligible to vote. *See* U.S. Const. amend. XXVI. He is now a college student studying political science. This case involves a political education of a different variety.

The election was scheduled for February 26, 2019. *See* Am. Cplt., at ¶ 26 (Dckt. No. 36). To get his name on the ballot, Krupa needed to file paperwork with the Chicago Board of Elections by November 26, 2018. *Id.* at ¶ 32. In particular, he needed to file "Nominating Petitions," containing the valid signatures of 473 registered voters in the Thirteenth Ward. *Id.*

The complaint alleges that Defendants tried to stymie Krupa's attempts to get on the ballot. *Id.* at ¶ 33. Defendants directed their operatives to make it difficult for Krupa to collect signatures. *Id.* at ¶ 34. Specifically, they directed their lackeys – muscle-bound, "large male operatives" – to follow Krupa as he went door to door, and stand behind him in a "hostile manner" as he talked to voters. *Id.* They intended to intimidate Krupa and creep out potential voters.

One day, Defendants directed their agents to tail him in a truck. *Id.* When Krupa started to speak with a group of voters at a house, the agents jumped out of the truck, approached the group and instructed the voters, "[D]on't talk to him!" *Id.* Then one of the agents turned to

Krupa and said, "You're a nice kid, but I'd hate to see something bad happen to you." *Id.* When Krupa asked for clarification, the operative responded, "I'd hate to see you get hurt." *Id.*

Defendants also directed their agents to harass Krupa and his family through fake social media accounts, and to threaten to release embarrassing photos. *Id.*

Despite those efforts, Krupa hurdled high above the bar for signatures. He collected 1,703 valid voter signatures, far more than the 473 signatures that he needed to get his name on the ballot. *Id.* at ¶ 36.

Krupa did what he had to do to get his name on the ballot, and then some. So Defendants got to work to get his name *off* the ballot.

Defendants allegedly sent political goons to go door to door, and get voters to revoke their support for Krupa through unscrupulous means. *Id.* at ¶ 38. The operatives tricked and bullied the voters into signing paperwork revoking their signatures. *Id.*

The complaint includes a long list of edgy tactics. They blocked "the path to the doorways of the homes of voters" in "a physically threatening manner" and denied "the voters entry into their own homes unless and until the voters agreed to sign statements revoking their signatures." *Id.* at ¶ 40. They lied, telling some voters that signing Krupa's petitions was "illegal" and that revocation was therefore "mandatory." *Id.* Sometimes they told voters that, by signing the revocation documents, they were just "certify[ing] [their] voter signature for election records." *Id.*

In a few instances, they would "affirmatively identify themselves as 'from the Alderman's Office' while showing identification as same" to back up their story that they only needed the voter's signature for administrative purposes. *Id.* The complaint alleges that they stooped to extortion, threatening to "cutoff of municipal services to voters" unless they revoked

their signatures. *Id.* And they were persistent, coming back multiple times "even after the first request was refused." *Id.*

That trickery was both too successful, and not successful enough. Recall that Krupa received 1,703 signatures. Defendants gathered revocations, and overshot the target.

Defendants challenged Krupa's petitions by filing 2,796 statements by voters claiming that they had signed Krupa's petitions and wished to revoke their support. *Id.* at ¶ 42. But only 187 statements came from people who had actually signed Krupa's petitions, meaning the petitions to get him on the ballot. *Id.* at ¶ 43. The remaining 2,609 of the 2,796 revocations came from people who had never supported Krupa in the first place. *Id.*

So, of the 1,703 original signatories, 187 voters withdrew their support, leaving a total of 1,516 valid signatures. That's more than a thousand signatures more than Krupa needed to get on the ballot.

Pause on those numbers for a second. Krupa received signatures from 1,703 voters. Later, Defendants filed statements from 2,796 voters, expressing a desire to revoke their signatures. More people wanted to revoke their support (2,796) than had supported him in the first place (1,703).

Only 187 of the 2,796 people who expressed a desire to revoke their signatures had, in fact, signed to get Krupa on the ballot. Someway somehow, 2,609 people signed something saying that they wanted to revoke signatures on documents that they had never signed.

On a human level, one can imagine that the political lackeys felt pretty pleased with themselves when they turned in 2,796 signatures from voters that purported to revoke support for Krupa. It's a lot of work to go door to door to get signatures, and collecting so many signatures undoubtedly took lots of time and effort. One can only imagine how they felt when they realized

6

that their attempt to railroad Krupa had gotten them nowhere. It must have been deflating to see 2,609 phony revocations go down the drain.

The record doesn't include any additional details about how 2,609 people signed something saying that they revoked their support for Krupa when they had never supported him in the first place. But in any event, Plan B flopped badly. Defendants withdrew their objection. *Id.* at ¶ 45.

Krupa landed safely on the ballot, and he hit the campaign trial.

A few weeks before election day, Krupa filed this lawsuit. *See* Cplt. (Dckt. No. 1). He sued Madigan, Quinn, and their respective organizations (*i.e.*, Thirteenth Ward Democratic Organization, and Citizens for Marty Quinn).

Krupa brought nine federal claims, including free speech and equal protection claims against each defendant (for a total of eight claims), plus a conspiracy claim. The complaint also includes two claims under the Illinois Election Code.

On election day, Krupa's name appeared on the ballot next to Quinn's. The voters had the final say, and it wasn't close. Krupa received only 1,746 votes to Quinn's 10,759 votes. Quinn won re-election with 86.04% of the vote. *See* Mtn. to Dismiss, at 2 (Dckt. No. 14).[2]

---

[2] The Court takes judicial notice of the election results under Federal Rule of Evidence 201(b)(2). The election results are accurately and readily determined from the City of Chicago's Board of Election Commissioner's website. *See* 2019 Municipal General Election Results, Chicago Board of Election Commissioners, https://chicagoelections.gov/en/election-results-specifics.asp (last visited Mar. 31, 2022). And election results are an appropriate subject of judicial notice. *See Bowen v. Bd. of Election Comm'rs of City of Chicago*, 2017 WL 3334854, at *5 (N.D. Ill. 2017) (taking judicial notice of alderman election results obtained from the City of Chicago's Board of Election Commissioner's website); *see also Badillo v. City of Stockton*, 956 F.2d 884, 887 n.1 (9th Cir. 1992) ("We have held that election results are an appropriate subject of judicial notice."). A vote tally is a public record.

The complaint requested damages, not equitable relief. Krupa isn't trying to get an injunction, so the complaint is not moot, even though the election is over. *Cf. Krislov v. Yarbrough*, 988 F.3d 975, 977–78 (7th Cir. 2021).

Defendants later moved to dismiss Krupa's claims. They moved to dismiss his federal claims for failure to state a claim. And in the event that the Court dismisses the section 1983 claims, they ask the Court to decline supplemental jurisdiction and dismiss the state law claims.

Months later, the case was reassigned to this Court as part of the initial allocation of cases. After reading the complaint, this Court invited Krupa to file a toned-down version, in keeping with the spirit of Rule 12(f). *See* 10/28/2019 Order (Dckt. No. 34). The original complaint included some inflammatory language, such as the allegation that Krupa was "on the attack" and would end the "vicious" and "rapacious reign" of corrupt politicians. *See* Cplt., at 1–2 (Dckt. No. 1). It also included a call to political arms (so to speak), encouraging his fellow Chicagoans to "follow the lead of David Krupa" to end the "Chicago Machine." *Id.* at 1. Political speeches are best delivered outside the courthouse.

Krupa later filed an amended complaint, which is now before the Court. *See* Am. Cplt. (Dckt. No. 36). His amended complaint brings the same claims as his original complaint. The amended complaint is less inflammatory, but it fails to state a claim.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must

8

give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**Analysis**

## I. Section 1983 Claims (Counts I–IX)

Defendants moved to dismiss Krupa's section 1983 claims for failure to state a claim. *See* Mtn. to Dismiss (Dckt. No. 14). They make several arguments, but the primary argument is about the lack of state action.

"Section 1983 addresses only *state* action." *L.P. v. Marian Catholic High School*, 852 F.3d 690, 697 (2017) (emphasis in original). The statute provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." *See* 42 U.S.C. § 1983. The text expressly includes a requirement that the defendant acted under color of law. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 930–35 (1982); *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010).

That statutory requirement stems from basic constitutional principles. Congress passed section 1983 "for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment,'" by giving citizens a private right of action. *See Lugar*, 457 U.S. at 934. Most constitutional rights, including those rights secured by the Fourteenth Amendment, "are

protected only against infringement by government." *Id.* at 936. Purely private conduct, "however discriminatory or wrongful," does not violate the Fourteenth Amendment. *Id.* (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974)); *see Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019); *see also Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009) ("The First and Fourteenth Amendments to the Constitution protect citizens from conduct by the government, but not from conduct by private actors no matter how egregious that conduct might be."). "Whether this is good or bad policy, it is a fundamental fact of our political order." *See Lugar*, 457 U.S. at 936.

To qualify as conduct "under color of law," an action must be "fairly attributable to the State." *Id.* at 937. "State action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad.*, 531 U.S. at 295 (citation omitted).

"What is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* Courts may consider any relevant factual matter, and no single fact is necessary or sufficient. *Id.* The conduct of private actors can constitute state action in a number of different situations. *See Hallinan*, 570 F.3d at 815 ("The Supreme Court has identified numerous situations when private conduct takes on the color of law.") (providing a list of examples); *see also Jackson*, 419 U.S. at 349–50 ("While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer.") (citation omitted); *Marian Catholic High School*, 852 F.3d at 696 ("A private person acts under color of state law when she is a willful participant in joint action with the State or its agents.") (cleaned up).

10

People wear different hats at different times. Not every act by a public official is state action. Public officials have private lives, too. Sometimes they act in a private capacity. That is, a public official has a personal life (like anyone else), and that private conduct does not become state action just because the person in question happens to be a public official. *See DiDonato v. Panatera*, 24 F.4th 1156, 1160, 1161 (7th Cir. 2022) ("[I]t is equally well settled that a 'mere assertion that one is a state officer does not necessarily mean that one acts under color of state law.' . . . That the defendant is a state employee is not enough.") (quoting *Gibson*, 910 F.2d at 1516). And on the flipside, private parties can sometimes qualify as state actors. *See, e.g.*, *Hallinan*, 570 F.3d at 815; *Spiegel*, 916 F.3d at 616. It all depends on the situation.

Krupa has three basic theories for why Defendants' actions are "fairly attributable to the State." *See Lugar*, 457 U.S. at 937.

First, Krupa argues that Quinn and Madigan acted in their public roles as an alderman and as a state representative, respectively, when they violated his rights. *See* Pl.'s Resp. to Mtn. to Dismiss, at 6–7 (Dckt. No. 22-1). Second, he argues that, even if they were acting outside their public roles, Quinn and Madigan have a monopoly on political power in the ward, so their actions supplanted core state functions. *Id.* at 6–10. And third, he argues that if Quinn and Madigan engaged in state action, then the two organizations (Thirteenth Ward and Citizens for Quinn) did too, because their actions are intertwined. *See* Am. Cplt., at ¶¶ 71, 81, 109, 119 (Dckt. No. 36).

The Court only needs to address the first and third arguments. The complaint includes enough to allege that Quinn and Madigan acted in a public capacity, at least in part. Some (but not all) of the actions could constitute state action. As a result, their organizations are state actors, too.

11

But in the end, it doesn't matter. Defendants did not deprive Krupa of a federal right, so the complaint fails to state a claim. He got on the ballot, despite the dirty tricks.

### A.    Madigan and Quinn:  Public Roles

First, Krupa alleges that Madigan and Quinn acted under color of law because they are state officials. That's a step in the right direction, but standing alone, it doesn't get Krupa all the way there.

Oftentimes, an actor "is an officer or employee of state government, and it is easy to conclude that the person's actions are fairly attributable to the state." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). But not every action taken by a state official or employee is attributable to the state. "Section 1983 does not cover disputes between private citizens, even if one happens to be an officer." *Plaats v. Barthelemy*, 641 F. App'x 624, 626–27 (7th Cir. 2016); *Wilson*, 624 F.3d at 392 ("Not every action by a state official or employee is to be deemed as occurring 'under color' of state law.") (citation omitted).

"To plead that a defendant acted under color of state law, a § 1983 plaintiff must allege that a defendant's invocation of state authority in one way or another facilitated or enabled the alleged misconduct." *DiDonato*, 24 F.4th at 1161; *see also Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) ("Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.") (cleaned up); *West v. Atkins*, 487 U.S. 42, 49–50 (1988) ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").

Officials who act "without the cloth of state authority" do not act under color of state law, and therefore cannot be held liable under section 1983. *See DiDonato*, 24 F.4th at 1161 (quoting *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989)); *see also Latuszkin v. City of Chicago*, 250 F.3d 502, 506 (7th Cir. 2001) ("[T]he complaint makes no allegation that Wilson was engaged in police activity, that he displayed any police power, or that he possessed any indicia of his office at the time of the accident. Because Wilson was engaged in entirely private behavior at the time of the accident, there is no claim for the violation of due process under *DeShaney*.").

A government official's duties under state law provide a starting point when determining whether his actions were *state* actions. *See Wilson*, 624 F.3d at 392 ("A state officer's conduct does not constitute acting under color of state law unless it is 'related in some way to the performance of the duties of the state office.'") (citing *Honaker*, 256 F.3d at 484–85). Courts first look to state law to determine the state actor's duties, before asking whether the alleged conduct is sufficiently related to one of those official duties. *Id.*; *see also Barnes v. City of Centralia*, 943 F.3d 826, 831 (7th Cir. 2019).

In the complaint at hand, it is not always easy to separate public action and private action. Perhaps by design. The complaint alleges that Madigan exercised enormous power, in governmental and political capacities. *See, e.g.*, Am. Cplt., at ¶¶ 11–16, 46 (Dckt. No. 36).

He wore two of the biggest hats in the state. He was the Speaker of the House, and he was the kingmaker of the Democratic Party. He controlled the purse – the public coffers, and political war chests – and he controlled the people in power, too. The complaint does not draw a bright line where the public power ends, and where the private power begins.

13

Worse yet, the complaint refers obliquely to the "agents and operatives" of Madigan and Quinn. *See id.* at ¶¶ 34, 40. They could be *government* operatives, or they could be *political* operatives. The complaint blurs them together.

By and large, the conduct alleged in the complaint is not related to the official duties of Quinn or Madigan. Most of the conduct is about running for office – and dirty tricks in connection with running for office. But running for office is not state action.

True, legislating was a big part of their jobs, and Quinn and Madigan needed to win reelection to continue legislating. But campaigning for reelection is private activity, unrelated to an official's state-sanctioned duties. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 396 (6th Cir. 2016) (concluding that members of Ohio Governor John Kasich's campaign staff were acting on behalf of Kasich in a private capacity, not "on behalf of the governor's office"); *Federer v. Gephardt*, 363 F.3d 754, 757 (8th Cir. 2004) (dismissing a complaint about campaign activity for failing to allege a state action because the complaint alleged only "that the defendants acted on behalf of [a Congressman] as a political candidate and private person," not as a government official). It is not an official responsibility to preserve one's power, or lengthen one's tenure in office.

An elected official runs for office to become part of the government. But it is not a government duty *to run* for office. The state *qua* state is indifferent to who sits in the seats. The job of an elected official is not to campaign to remain an elected official. It's how you get there, but it's not part of the job.

Kneecapping your political opponent is not state action, either, unless the bad acts involve the use or invocation of government power. So, sending a government worker to do a political misdeed could count as state action. And sending a political operative to create

14

mischief could constitute state action, too, if the underling receives instructions to invoke the power of the state. If the person is actually wearing a public hat, or purports to wear a public hat, that wardrobe counts as state action.

An official's invocation of state authority can be sufficient, on its own, to transform his or her actions into state actions. *See Robinett v. City of Indianapolis*, 894 F.3d 876, 881–82 (7th Cir. 2018) ("Action taken by a state official who is cloaked with official power and who purports to be acting under color of official right is taken under color of state law whether or not the action is in fact in excess of the authority actually delegated to the official.") (quoting *Lopez v. Vanderwater*, 620 F.2d 1229 (7th Cir. 1980)) (cleaned up).

The question is not whether the acts fell within the official's job duties. A public official can engage in state action even if the official oversteps the boundaries of the job. *See Screws v. United States*, 325 U.S. 91, 111 (1995) ("It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."); *Plaats*, 641 F. App'x at 627. The question is whether the official *invoked* state authority and, under the guise of that authority, "facilitated or enabled the alleged misconduct." *See DiDonato*, 24 F.4th at 1161; *cf. Wilson*, 624 F.3d at 394 ("The cases in which we have found that an official's conduct may constitute state action even when the conduct exceeds the official's grant of authority are of no assistance to the plaintiffs here. . . . The complaint is devoid of any allegation that Price bore any indicia of his position as an alderman or that he invoked his aldermanic office in any way, even to identify himself as an alderman at any point during the confrontation.").

Here, it is useful to separate the conduct before Krupa got on the ballot, and the conduct after Krupa got on the ballot. That is, it is helpful to consider the attempts to keep Krupa from getting signatures, and the attempts to obtain revocations of those signatures. Think of it as Plan A and Plan B. Plan A is about keeping Krupa from getting *on* the ballot, and Plan B is about getting Krupa *off* the ballot.

Plan A involved the attempt to keep Krupa from getting *on* the ballot by interfering with his efforts to collect signatures. On that score, the complaint does not include sufficient facts to give rise to an inference of state action. The complaint does not allege that the Defendants acted in the capacity as public officials. They did not exercise any public power, or exert their governmental authority in any way. And their lackeys did not invoke public power, either. They harassed Krupa, but did not purport to act as agents of the state. *See* Am. Cplt., at ¶¶ 33–36 (Dckt. No. 36) (entitled "Defendants' Initial Conspiracy" to keep him from getting signatures).

Plan B involved the attempt to get Krupa *off* the ballot, and it yields a different answer. *Id.* at ¶¶ 37–40 (entitled "Defendants' Extended Conspiracy" to obtain revocations). The complaint alleges that the operatives clothed themselves with the authority of the state (at least in part) when they obtained revocations from the voters. The agents affirmatively identified themselves as "from the Alderman's Office" while flashing government IDs. *Id.* at ¶ 40.

Standing alone, that allegation might not be enough to rise to the level of state action. *Cf. Askew v. Bloemker,* 548 F.2d 673, 677 (7th Cir. 1976) ("[M]ere assertion that one is a state officer does not . . . mean that one is acting under color of state law."). What does it mean that the agents identified themselves as people from the alderman's office? The government office, or the campaign office?

16

But the operatives did more. They showed government IDs, and then threatened to withhold municipal services. *See* Am. Cplt., at ¶ 40 (Dckt. No. 36); *see also id.* at ¶ 20 (alleging that an alderman has control over city services). Defendants sent agents to "threaten a cutoff of municipal services to voters in the 13th Ward who signed Nomination Petitions for [Krupa] if they would not sign documents revoking their signatures on Nomination Petitions of [Krupa]." *Id.* at ¶ 40.

This isn't a case of state actors merely showing government IDs. The agents threatened to withhold public services. That's public action, not private action. The state controls the public purse, and all of the services that it can buy.

Viewed in a light favorable to Krupa, the complaint alleges that the agents invoked state power to facilitate their attempt to derail Krupa's candidacy. *See Honaker*, 256 F.3d at 484; *see also DiDonato*, 24 F.4th at 1161. Krupa has therefore alleged state action, at least when he alleges that they threatened to withhold public services.

## B.     The Organizations

Finally, Krupa alleges that two private organizations – Thirteenth Ward, and Citizens for Marty Quinn – acted under the color of law.

"[A] private entity can qualify as a state actor in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

Krupa's allegations fall into the third circumstance, meaning "when the government acts jointly with the private entity." *Id.* In other words, when a private organization is sufficiently

17

"entwined" with state actors, it is a state actor. *See Brentwood*, 531 U.S. at 298; *see also Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

Krupa alleges that Madigan and Quinn dominate both organizations. If Madigan and Quinn are state actors, so are their organizations, especially when the organizations allegedly participated in the conduct in question. *See* Am. Cplt. at ¶¶ 71, 81, 109, 119 (Dckt. No. 36) (alleging that the organizations acted under color of law because they were "intertwined" with Quinn and Madigan). And since Madigan and Quinn are state actors, Citizens for Quinn and Thirteenth Ward are state actors, too.[3]

## C.     No Injury

Most of the conduct alleged in the complaint does not constitute state action. The one exception is the allegation that the political operatives went door to door, and threatened to withhold municipal services unless the voters signed revocations. That is, the operatives induced voters to sign statements saying that they revoked their support for Krupa.

That allegation cannot give rise to a claim, even if it involved state action. The existence of state action can get a plaintiff only so far. A claim under section 1983 requires an allegation that the state actor deprived the plaintiff of a federal right. *See Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2015) ("To succeed on their § 1983, plaintiffs must prove (1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law."); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("In

---

[3] As an aside, it's not entirely clear what either organization did to Krupa. In his complaint, Krupa gives some basic background information on Citizens for Quinn and the 13th Ward Democratic Organization. But once he launches into his actual allegations, Citizens for Quinn isn't mentioned again in the narrative. And he mentions the 13th Ward only once. *See* Am. Cplt., at ¶ 34 (Dckt. No. 36) (noting "on information and belief" that some of the people who followed Krupa door to door were "agents of 13th Ward"). In the most generous reading of the complaint, Krupa alleges that the 13th Ward and Citizens for Quinn sent their agents to follow him from door to door, and to harass voters who signed his petitions. Since the organizations worked jointly with state actors – Madigan and Quinn – they too qualify as state actors.

18

order to state a cause of action under 42 U.S.C. § 1983, the Supreme Court requires only two elements: 'First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of the right acted under color of state . . . law.'") (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *see also Martin v. Marinez*, 934 F.3d 594, 598 (7th Cir. 2019) ("The 'basic purpose' of damages under § 1983 is to compensate persons for injuries that are caused by the deprivation of constitutional rights.'"). But here, Defendants didn't deprive Krupa of a federal right.

Recall the math. Krupa needed 473 signatures, and obtained 1,703 signatures. Defendants then used dirty tricks to obtain revocations from 2,796 people. But of those people, only 187 had supported Krupa in the first place. The rest of the revocations didn't deprive Krupa of his rights because they didn't revoke anything. There was no support to revoke.

The revocations from the 187 voters – meaning the voters who originally supported Krupa, and then took it back – did not deprive Krupa of his rights, either. Again, recall that Krupa needed only 473 signatures, but he obtained 1,703. If Defendants used dirty tricks to reduce that number by 187, then Krupa still had more than 1,000 signatures to spare. He got on the ballot, safe and sound.

And math is not the only reason why the complaint doesn't allege an injury. The complaint is at a high level of generality. That is, Krupa alleges that Defendants had a big bag of dirty tricks, and used those tricks on the voters. One of those tricks was the threat to withhold municipal services. Maybe that threat affected the 187 voters who revoked their signatures. Or maybe not. But again, even if the threat affected those 187 voters, it wouldn't matter, because Krupa remained on the ballot without them.

19

The dirty tricks weren't enough to keep Krupa off the ballot, so he must come forward with some other deprivation. But the complaint does not allege that Krupa suffered any other type of deprivation from the submission of the extorted revocations. *Cf. Krislov v. Rednour*, 226 F.3d 851, 857–58 (7th Cir. 2000). For example, the complaint does not allege that Krupa had to go back out on the campaign trail to gather additional signatures once Defendants came forward with revocations. And it doesn't allege that Krupa needed to spend additional funds to fight Defendants' challenge to his signatures.

At most, the complaint alleges an attempted (or maybe botched) deprivation of a right. But an attempt to deprive a right is not enough. *See, e.g.*, *Duehning v. Aurora E. Unified Sch. Dist. 131*, 102 F. Supp. 3d 968, 976 (N.D. Ill. 2015) ("The Seventh Circuit has made clear 'that the mere *attempt* to deprive a person of his First Amendment Rights is not, under usual circumstances, actionable under section 1983.'") (emphasis in original) (collecting cases) (quoting *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir. 1987)); *see also Roach v. City of Evansville*, 111 F.3d 544, 549 (7th Cir. 1997) (""[The plaintiff] has not shown any actual deprivation of rights by the City, and cannot sustain a Section 1983 claim on that basis alone."); *Vaden v. Village of Maywood*, 809 F.2d 361, 366 (7th Cir. 1987) ("To state a claim for relief under 42 U.S.C. § 1983, [the plaintiff] must allege not only that the defendants conspired under color of state law to deprive her of her constitutional rights, but also that she was in fact deprived of those rights."); *Reichenberger v. Pritchard*, 660 F.2d 280, 285 (7th Cir. 1981) ("The first inquiry in any § 1983 suit is whether the plaintiff has been deprived of a right secured by the Constitution and laws of the United States. Furthermore, the complaint must allege an actual deprivation of rights resulting from the defendants' acts.") (citations omitted); *Antonelli v. Sherrow*, 2005 WL 2338813, at *9 (N.D. Ill. 2005) ("An attempt to violate constitutional rights

20

is not actionable; there must be an actual violation of the right."), *aff'd*, 246 F. App'x 381 (7th

Cir. 2007).

Krupa can't have a claim without a deprivation of a federal right. *See Warren County*,

830 F.3d at 468; *Alvarado*, 267 F.3d at 651. Krupa alleges that Defendants threatened to

withhold municipal services if voters did not revoke their support. Even if that allegation is

taken as true, that allegations does not give rise to a claim because that threat did not deprive

Krupa of his rights. He still got on the ballot, and it didn't cost him any extra time or money.

## III.    State Law Claims (Counts X–XI)

Finally, in light of the dismissal of the federal claims, the Court has dismissed "all claims

over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). So, the Court "may decline

to exercise supplemental jurisdiction" over the remaining claims. *Id*.

The Court elects not to exercise supplemental jurisdiction. The state court is in a better

position to adjudicate questions of state law, especially state law about local elections. Counts X

and XI are therefore dismissed without prejudice.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted.

Date:   March 31, 2022

_____

Steven C. Seeger
United States District Judge